Filed 5/24/21  Marriage of Koury CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of ERIN KATHLEEN and JEFFREY ALAN KOURY. | |
| ERIN KATHLEEN KOURY,<br><br>    Appellant,<br><br>        v.<br><br>JEFFREY ALAN KOURY,<br><br>    Respondent. | G058534<br><br>(Super. Ct. No. 11D002189)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Julie A. Palafox, Judge.  Reversed.

Law Offices of Marjorie G. Fuller and Marjorie G. Fuller for Appellant.

Law Office of John T. Bachmayer and John T. Bachmayer for Respondent.

*        *        *

This is an appeal by Erin from an order modifying her spousal support downward from $14,000 to $5,000 per month.[1] We hold the court erred in two ways.

First, the court relied on Jeffrey's potential future medical expenses, which even Jeffrey described as a "bad estimate" and a "guess." Speculative future expenses cannot be taken into consideration under Family Code section 4320.[2]

Second, a modification of spousal support must be based on the factors enumerated in section 4320, which, in turn, are based on the marital standard of living. The court disregarded the marital standard of living, however, describing it as being "of nominal value" and "no longer of significance." The resulting award reflected that reasoning, with Jeffrey enjoying the lavish standard of living the parties enjoyed during their long-term marriage, while Erin was provided a standard of living well below that, barely enough to meet her ongoing expenses. The court reasoned that the two no longer earned enough money for both to enjoy the marital standard of living. But the fact that they do not earn enough to separately live at the marital standard of living—a common enough occurrence—does not justify disregarding the marital standard of living entirely and providing one party a standard of living dramatically higher than the other. The marital standard of living is still the reference point in setting the amount of support. Accordingly, we reverse.

## FACTS

Erin and Jeffrey were married in 1989 and permanently separated in 2010. Erin filed for dissolution in 2011, and a status-only judgment dissolving the marriage was entered in 2015, reserving the issues of support and property division.

---

[1] We refer to the parties by their first names to avoid confusion. We mean no disrespect.

[2] All statutory references are to the Family Code.

Prior to entering the status-only judgment, the court made findings regarding the marital standard of living in order to set pendente lite spousal support. In 2012, Jeffrey's income was $38,250 per month, not including bonuses. Although his annual income occasionally exceeded $1 million the court found that his average annual income was $552,508. The parties' lifestyle, according to the court, "included the purchase of investment homes in Florida, Whistler, Canada, and Mammoth Lakes, California." The court heard evidence of vacations, educational expenses, and spending habits, including that Erin never had a budget limiting her purchases. The court concluded the parties led a "certainly very upper middle class" lifestyle, and that the marital standard of living could be provided to Erin by an average annual income of $320,000, which amounted to $26,667 per month. The pendente lite spousal support was set at $12,500 per month, plus an *Ostler-Smith* component of 30 percent of any income exceeding Jeffrey's salary, not to exceed $170,000 per year.[3]

In 2016, the court held a trial on the issue of permanent spousal support. In addition to taking judicial notice of the prior findings concerning the marital standard of living, the court added the following findings: for most of the marriage, Erin was a homemaker; they had no monthly budget; their monthly expenses averaged $20,328; the children went to a private high school and were given college educations; the parties lived in a 4,100 square foot home in Dove Canyon; they took 10-day vacations every year to various places around the world; they drove nice vehicles; and Erin generally did not need to work and had disposable income to enjoy extras and amenities.

With regard to Erin's ability to work, the court noted, Erin 'is a college graduate with a degree in psychology from UCLA. After college [Erin] worked for seven years as a medical supply buyer. After the parties started having children, by agreement of the parties, [Erin] became a full time homemaker and has not worked outside the home

---

[3] See *In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33, 37.

in more than 25 years." The court found Erin "had a promising career path when the parties met and married," but "gave up her career path by mutual agreement and became a full time homemaker."

With regard to Jeffrey's ability to pay, the court found, Jeffrey "currently earns $51,000 a month as the CEO of Tennet Healthcare and receives a generous annual bonus."

The court issued a *Gavron* warning to Erin, and chided her for not doing more in the six years since separation to become more self-supporting.[4] "Instead of seeking any education, training or even updating needed computer skills after the parties separated, [Erin] has continued to maintain her pre-dissolution privileged lifestyle. [¶] [Erin] has chosen not to better herself nor make efforts to contribute towards her own needs. [¶] [Erin's] failure to move forward after the marriage ended appears to be based on unresolved anger and/or a belief she is somehow entitled to [Jeffrey's] permanent support. This is not the purpose of spousal support. [¶] [Erin's] failure to seek employment or make efforts toward her betterment over the last six years is unreasonable." "[Erin] should be able to earn the additional graduate degree she desires and/or find a good paying position commensurate with her education and skills within the next four years."

The court awarded Erin spousal support of $14,000 per month, plus 25 percent of Jeffrey's annual bonus, not to exceed $150,000 annually (for a combined support of up to $318,000 per year). The award was to "continu[e] monthly . . . until the death of either party, the re-marriage of [Erin], or further order of the Court . . . ." "The purpose of the additional support is to give [Erin] opportunities for savings, investments and vacations consistent with the established marital standard of the parties."

---

[4] See *In re Marriage of Gavron* (1988) 203 Cal.App.3d 705.

In February 2019, Jeffrey filed a request to modify spousal support, which is the order at issue in this appeal. Jeffrey sought to completely eliminate spousal support, but suggested that if the court were inclined to maintain support, an award of $2,500 would be appropriate. Erin maintained that spousal support should remain at $14,000 per month, but that if a reduction were to be made, $10,000 per month would be reasonable.[5]

A number of circumstances had changed since the prior support award. Jeffrey had retired and his retirement plan paid him a reduced monthly income of $31,726 per month, plus some nominal investment returns. Erin had essentially completed a master's degree in legal studies and was earning $4,333 per month as an administrative assistant. The court commended Erin on heeding the *Gavron* warning and found that she had acted reasonably in her efforts to become self-supporting. The court recognized she still suffered "a reduced earning capacity from the years she was outside the workforce."

Jeffrey's health had markedly declined as he was battling lymphoma. After an initial round of chemotherapy treatment, the lymphoma had gone into remission, but by the time of the hearing, the cancer had returned. This time, it was not responding well to chemotherapy and Jeffrey intended to seek experimental treatment. Although Jeffrey listed his anticipated medical expenses at $7,500 per month, in a pretrial filing Jeffrey described these expenses as "unknown" and in an "indeterminate time, in an indeterminate amount." At trial, he described the $7,500 as "all a guess" and "a bad estimate because . . . I don't know what these [expenses] are."

Ultimately, the court modified Erin's spousal support from the $14,000 per month she was receiving under the prior arrangement, to $5,000 per month. This

[5] Due to the loss of the *Ostler-Smith* component, Erin's support had already dropped from an average of approximately $22,500 per month to $14,000 per month, which was approximately a 38 percent reduction.

represented a nearly 78 percent decline from the original support order in which Erin was receiving an average of $22,500 per month. In assessing the section 4320 factors, the court described the marital standard of living as "of nominal value," and "no longer of significance." It apparently reached this conclusion because "neither party can live at the previously determined [marital standard of living]." Accordingly, the court gave "greater weight to the parties' current needs and incomes. ERIN needs $10,000 a month but can realistically earn only $5,000 a month. JEFFREY needs $18,000 a month and is receiving $32,000 a month." The $18,000 figure included the $7,500 in anticipated medical expenses for the experimental treatment.

Erin timely appealed.

## DISCUSSION

Erin contends the court abused its discretion in setting the amount of spousal support. In any proceeding to modify spousal support, the court engages in a two-step analysis. First, the court examines whether there has been a change of circumstances that might warrant a modification of support. "Absent a change of circumstances, a motion for modification is nothing more than an impermissible collateral attack on a prior final order." (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 480.) Here, the parties stipulated there was a change of circumstances. Second, the court determines the amount of spousal support by analyzing the 14 factors listed in section 4320. (*In re Marriage of Shimkus* (2016) 244 Cal.App.4th 1262, 1273.) "Even upon proof of a change of circumstances, 'modification is not necessarily mandated given the court's obligation to reconsider the statutory standard . . . .'" (*In re Marriage of Berman* (2017) 15 Cal.App.5th 914, 920.)

We review a court's decision for abuse of discretion. (*In re Marriage of Smith, supra*, 225 Cal.App.3d at p. 480.) "But the 'court may not be arbitrary; it must exercise its discretion along legal lines, taking into consideration the applicable circumstances of the parties set forth in [the statute], especially reasonable needs and

6

their financial abilities.' [Citation.] Furthermore, the court does not have discretion to ignore any relevant circumstance enumerated in the statute. To the contrary, the trial judge must both recognize and *apply* each applicable statutory factor in setting spousal support. [Citations.] Failure to do so is reversible error." (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 304.) Here, we conclude the court did not properly apply the section 4320 factors.

*1. The Needs of the Parties*

We begin with the evidence as it relates to the needs of the parties. (See § 4320, subd. (d) ["needs of each party based on the standard of living established during the marriage"].) Jeffrey filed an income and expense declaration that listed over $20,000 in monthly expenses. The court reduced that to about $18,000 because approximately $2,000 related to maintaining property that would be sold in the division of community property. Of the remaining $18,000 in needs, $7,500 was devoted to anticipated medical expenses—$5,000 for expenses not covered by insurance, and $2,500 for a COBRA premium to maintain his insurance.

These anticipated medical expenses were entirely speculative. Jeffrey variously described those expenses as "unknown," for an "indeterminate time, in an indeterminate amount," "all a guess," and "a bad estimate because . . . I don't know what these [expenses] are." Even Jeffrey's counsel assumed those claims would not be considered in setting the amount of support, stating, "If you back out . . . the . . . speculative costs for medical, . . . you can take $7500 off of that [$]20,000."

Speculative expenses cannot be considered in setting a spousal support award. "Although the court has broad discretion in ordering or modifying an order of spousal support, 'orders for changes in support to take effect in the future must be based upon reasonable inferences to be drawn from the evidence, not mere hopes or speculative expectations.'" (*In re Marriage of Prietsch & Calhoun* (1987) 190 Cal.App.3d 645,

7

656.)  "[A]n order for spousal support must be based on the facts and circumstances existing at the time the order is made.  [Citation.]  ""'[T]he power to make such orders must be held to be limited to the conditions and circumstances existing at the time they are made.'"""  (*In re Marriage of Sinks* (1988) 204 Cal.App.3d 586, 592.)  In basing the spousal support amount on speculative future expenses, the court abused its discretion.

This error was prejudicial.  Not only did the speculative expenses exaggerate Jeffrey's needs by almost 75 percent, but the court's various comments indicated they impacted its analysis.  The court explicitly indicated it was going to give the health issue substantial weight in its analysis.  More tellingly, toward the end of the hearing, when, as noted above, Jeffrey's counsel seemed to recognize that these expenses were speculative and should not be considered, the court cautioned him, saying, "Don't tell me to back it out because you're not going to like the result if I do."  Essentially, the court was saying the spousal support would be set higher in the absence of the speculative medical expenses.  Accordingly, by erroneously relying on those expenses, the court prejudicially erred.

*2.  The Marital Standard of Living*

As an independent basis for reversal, we also conclude the court's legal analysis was flawed by failing to account for the marital standard of living.  The starting point in any analysis of spousal support is the marital standard of living.  (§ 4330, subd. (a) ["In a judgment of dissolution of marriage or legal separation of the parties, the court may order a party to pay for the support of the other party an amount, for a period of time, that the court determines is just and reasonable, *based on the standard of living established during the marriage*, taking into consideration the circumstances as provided in Chapter 2 (commencing with Section 4320)" (italics added)].)  The marital standard of living "'furnishes a *point of reference* to be used in weighing all of the parties' circumstances.'"  (*In re Marriage of Smith, supra*, 225 Cal.App.3d at p. 484.)  Indeed, multiple factors in section 4320 explicitly incorporate the marital standard of living.

8

(§4320, subds. (a) ["extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage"], (c) ["ability of the supporting party to pay spousal support, taking into account . . . earning capacity, earned and unearned income, assets, and standard of living"], (d) ["needs of each party based on the standard of living established during the marriage"].) "In practice, the marital standard provides a 'threshold or starting point' from which courts are to *begin* consideration of *all* of the [section] 4320 factors.'" (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2019) ¶ 6:949 (Hogoboom & King).)

The court essentially disregarded the marital standard of living, however, describing it as having "nominal value" and being "no longer of significance." It reasoned that "neither party can live at the previously determined [marital standard of living]."

It is a common enough circumstance that, after separation, both parties cannot maintain the marital standard of living. "In most instances, it is impossible at separation for either party to have sufficient funds to continue to live in the same life-style enjoyed during the marriage. After separation the parties have two households rather than one, and with California's high housing costs this represents a significant increase in living expenses." (*In re Marriage of Smith, supra*, 225 Cal.App.3d at pp. 488-489.)

But that circumstance does not render the marital standard of living irrelevant. Indeed, the very first subdivision in section 4320 directs the court to account for "[t]he *extent to which* the earning capacity of each party is sufficient to maintain the standard of living established during the marriage . . . ." (*Id.*, subd. (a), italics added.) So even if the parties can no longer separately attain the marital standard of living, the starting point is the extent to which they can. In this case, Jeffrey earned roughly $32,000 per month, and Erin roughly $4,000 per month. Dividing the sum of the

9

incomes by two nets a potential standard of living of $18,000 per month for each of them.[6]

Of course, we are not suggesting that the court was bound by this exact amount. This is merely the starting point and may be modified significantly after consideration of all of the section 4320 factors. But it was an abuse of discretion to simply disregard the standard of living.

That disregard influenced the ultimate support award and was thus prejudicial. For example, in her income and expense declaration, Erin claimed an expense of $2,000 per month for purposes of savings. This is generally allowable as an element of the marital standard of living: "The parties' history of *saving* significant portions of their income during marriage should be considered as an element of their marital standard of living, and thus an element of 'need' for support, where consistent with the obligor's ability to pay." (Hogoboom & King, *supra*, ¶ 6:892.5.) There was evidence of such marital savings here.

However, the trial court stripped that out, and instead considered only Erin's monthly expenses. The court commented, "Given the change in circumstances and recognizing neither party has the ability to contribute toward monthly savings anymore, without savings ERIN's monthly needs are $10,700 a month." But the court's finding that "neither party has the ability to contribute toward monthly savings anymore" was demonstrably wrong. Jeffrey's income was approximately $32,000 per month. His expenses, even with the erroneously included speculative medical expenses, were $18,000 per month. The support award was $5,000 per month. That left Jeffrey with a

---

[6] Incidentally, this would require a $14,000 support payment from Jeffrey, which is exactly what he was paying prior to the modification, and would leave him with the exact amount of his needs according to the court's finding (even including the speculative medical expenses).

disposable $9,000 per month to save or spend as he saw fit, which was easily enough to support $2,000 in savings. Meanwhile, Erin was given just enough to pay her bills.

In *In re Marriage of Fransen* (1983) 142 Cal.App.3d 419, the court reversed a support award where the trial court did exactly what our court did, arrive at a support amount by subtracting income from the expenses listed on the income and expense declaration. The court stated, "[T]he trial court must not limit itself to an award based entirely upon need." (*Id.* at p. 425.) It commented that by doing so, the court had "completely frustrated the design and purpose" of the statutory framework. (*Ibid.*) Section 4320, subdivision (d), requires the court to look not simply at bare needs, but "[t]he needs of each party *based on the standard of living established during the marriage*." (Italics added.) The savings component of Erin's expense declaration plainly qualified. The court's failure to heed the parties' marital standard of living, therefore, prejudiced Erin.

Moreover, the prejudice went beyond the specific example of savings, and generally infected the amount of support the court awarded. Broadly speaking, "It is inequitable after a long marriage to supply the husband with a continued standard of living much higher than the wife's." (*In re Marriage of Beust* (1994) 23 Cal.App.4th 24, 30; see Hogoboom & King, *supra*, ¶ 6:953.) The result of the court's order was to leave Jeffrey with $27,000 per month, which is slightly *higher* than the standard of living during the marriage. Erin, by contrast, was left with $10,000 per month, which was nowhere near enough to approach the marital standard of living.

Recently, a spousal support award was reversed under similar circumstances in *In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83. There, during their 21-year marriage (*id.* at p. 89), the parties lived an upper class lifestyle, with the husband working and the wife tending the home (*id.* at p. 109). The husband's monthly income was $47,040 (*id.* at pp. 109-110), and the wife's monthly income from investment returns was $20,790 (*id.* at p. 110). The court ordered the husband to pay

11

permanent spousal support of $5,000 per month (*id.* at p. 109), but failed to identify what the wife's needs were in light of the marital standard of living. In reversing, the court commented, "we are left to guess what evidence, if any, supported the trial court's determination that the support award is sufficient to meet [the wife's] 'needs.' Nor did the trial court relate the amount of the award to the marital standard of living." (*Id.* at pp. 110-111.)

The case for reversal here is even starker. Unlike the wife in *In re Marriage of Ciprari*, who had substantial income of her own, Erin, who through mutual agreement of the parties gave up her promising career 25 years earlier, was left with modest income potential that falls far short of the marital standard of living. Just as in *In re Marriage of Ciprari*, the court failed to relate the $5,000 support award to Erin's needs "*based on the standard of living established during the marriage.*" (§ 4320, subd. (d), italics added.) That was an abuse of discretion that prejudiced Erin.

## DISPOSITION

The postjudgment order modifying spousal support is reversed.


THOMPSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


GOETHALS, J.

12